EVAN C. NELSON (SBN 172957)
JONATHAN MCDOUGALL, ESQ. (SBN 212359)
LAW OFFICE OF JONATHAN MCDOUGALL
1640 Laurel Street
San Carlos, CA  94070
Telephone: (650) 594-4200
Email:  jonathan@mcdlaw.net; evancnelson.law@gmail.com

*Attorneys for Plaintiffs Richard K. Rogers and
Coastal Preserve LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RICHARD K. ROGERS AND COASTAL PRESERVE LLC**<br><br>                                            Plaintiffs,<br><br>        v.<br><br>**SUZANNE DELEON, TODD AJARI, MICHELLE BATTAGLIA, JAMES OBER, RICHARD SAMPSON, RANDI ADAIR, STEPHEN ADAMS, COUNTY OF SAN MATEO, CRYSTAL CHAU, RUMIKA CHAUDHRY, AND DOES 1-15,**<br><br>                                            Defendants, | Case No. _____<br><br>COMPLAINT FOR DAMAGES; REQUEST FOR JURY TRIAL<br><br>**1.  Violation of Fourteenth Amendment-Equal Protection**<br>**2.  Violation of Fifth Amendment-Takings**<br>**3.  Violation of Procedural Due Process**<br>**4.  Violation of Substantive Due Process**<br>**5.  Violation of Fourteenth Amendment-State Created Danger**<br>**6.  Violation of First Amendment-Chilling Citizen's Exercise of Rights** |

Plaintiff alleges the following Complaint:

## INTRODUCTION

This case is based on Defendants', and each of their, participation in a conspiracy to unconstitutionally target Plaintiff Richard K. Rogers, which scheme was designed to effect an unconstitutional taking of his property through (i) denial of equal protection of the laws (Plaintiff was not treated as every other landowner in the San Gregorio Creek Watershed) (ii) deprivation of appropriate due process (Plaintiff was deprived notice and opportunity to challenge agency citation of alleged violations prior to being pursued with civil prosecution) and (iii) without

1

paying just compensation for the taking of his property. Each of the Defendants, other than Defendant County of San Mateo, was acting under color of state law through their positions as government officials and employees, in an investigative function or role, and are sued here in their individual capacities, not in their official capacities. Defendant County of San Mateo (or "Defendant County") is sued for its policies and procedures discussed herein, which violated and impaired Plaintiff's constitutional rights.

Plaintiff's Complaint for damages is based on Defendants' conduct and includes claims for (1) violation of equal protection (the selective prosecution of only Plaintiff could be instituted against virtually every landowner in the watershed based on the same unquantified, unqualified and highly generic allegations made against Plaintiff); (2) improper taking and without providing just compensation; (3) violation of procedural due process by not providing notice and opportunity to be heard (meaningful opportunity to contest agency conclusory findings stated in letter following initial site inspection) prior to encumbering Plaintiff's rights and property through initiation of civil prosecution; (4) violation of substantive due process through arbitrary, irrational and unreasonable governmental action resulting in devaluation and deprivation of property and carried out with deliberate indifference to Plaintiff's fundamental rights; (5) establishing a state created danger by enjoining Plaintiff's right to maintain and use an existing road on his property in the manner historically necessary to allow for the road to be accessed by equipment and used to conduct emergency work to protect both life and property during recurrent landslide and flooding events; and (6) chilling a citizen's exercise of rights to defend against/challenge agency action.

1.     Plaintiff Richard K. Rogers and his company Coastal Preserve LLC ("Plaintiff") are resident of the State of California and owner of 114.44 acres of land off La Honda Road in San Gregorio within San Mateo County, which is comprised of two parcels connected by a horseshoe-shaped road that has provided the sole legal access between the two parcels since the mid-1900s, and even back into the 1800s.

2.     Defendant James Ober ("Defendant Ober") is an enforcement officer with California Department of Fish & Wildlife ("CDFW") who resides in San Mateo County at a property neighboring Plaintiff's property and Defendant Ober works for CDFW in San Mateo County.

3.     Defendant Michelle Battaglia (Defendant Battaglia) is an Environmental Scientist with CDFW who works in San Mateo County and is believed to reside in San Ramon, California.

4.     Defendant Richard Sampson is a California Department of Forestry and Fire Protection ("Cal FIRE") enforcement officer who works for Cal FIRE in San Mateo County and resides in Half Moon Bay, California.

5.     Defendant Todd Ajari was a CDFW enforcement officer who is believed to reside in Benicia, California and formerly worked for CDFW in San Mateo County.

6.     Defendant Suzanne DeLeon is a CDFW Environmental Scientist who works for CDFW in San Mateo County and is believed to reside in Scotts Valley, California.

7.     Defendant Randi Adair is a CDFW Supervising Environmental Scientist who worked for CDFW in San Mateo County supervising Defendant Suzanne DeLeon.

8.     Defendant Crystal Chau is a Deputy District Attorney for San Mateo County.

9.     Defendant Rumika Chaudhry is a San Mateo County GIS and Open Data Supervisor.

10.  Defendant County of San Mateo resides and operates within San Mateo County.

11.  Defendant Stephen Adams is an attorney and Chief of CDFW's Information Technology Services Branch located in Sacramento, California.

12.  DOES 1 – 5 are unnamed CDFW attorneys who, along with Defendant Stephen Adams, purportedly authorized unlimited warrantless searches, targeting of Plaintiff for disparate treatment based on a gross mischaracterization of the decision in *Siskiyou County Farm Bureau v. Department of Fish and Wildlife*, 237 Cal.App.4th 411 (2015), and supported or implemented systematic destruction of electronic evidence through automated systemwide deletions of emails combined with wiping of devices (e.g., laptops and cellular phones) without implementing protocols for litigation holds or other necessary evidence preservation procedures to protect the integrity of investigations and resulting civil or criminal enforcement actions.

13.  At all times herein mentioned, Defendants, and each of them, were the supervisors, agents, servants, employees, and joint venturers of each of the remaining Defendants, and were at all times herein mentioned acting within the course, scope, and purpose of said agency, employment, business, and joint venture.

3

14.  To the extent that the conduct and omissions alleged herein were perpetrated by one or more of the Defendants, the remaining Defendants confirmed and ratified said conduct and omissions. All allegations made in this complaint to any act or omission on the part of a Defendant or Defendants shall also be deemed to refer to the act and/or omission of each Defendant. At all relevant times, Defendants and each of them were the knowing agents and/or alter egos of one another.

15.  Defendants and each of their officers, directors and managing agents directed, approved and/or ratified the conduct of each other and of their co-defendants, agents and employees, as is more fully alleged herein.

**JURISDICTION**

16.  This action arises under Title 42 of the United States Code, Section 1983. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331 and 1343 under federal question jurisdiction.  The unlawful acts and practices alleged herein occurred in the County of San Mateo, which is within this judicial district.

**VENUE**

17.  Plaintiff owns real property in this District and resides in this District. The actions and occurrences that form the basis of this claim arose in this District. Each and every of Defendants Ober, Battaglia, Sampson, DeLeon, Ajari, Adair, Chau, Chaudhry and County of San Mateo reside in this District and/or works or operates in this District. Venue is proper in the United States District Court for the Northern District of California.

**DIVISIONAL ASSIGNMENT**

18.  This action should be assigned to the San Francisco or Oakland Division, pursuant to Civ. L.R. 3-2 subd. (c) – (d), as the subject property is located in San Gregorio, California in San Mateo County and a substantial part or all of the relevant events took place in San Mateo County.

**FACTS**

19.  Defendants Sampson, Ober, DeLeon, Ajari, Battaglia, Adair and DOES 1 - 5 acted in their individual capacities and under color of state law as state government officials and enforcement officers for Cal FIRE (Sampson) and CDFW (Ober, Ajari), as investigating

4

scientists for CDFW (DeLeon, Adair and Battaglia) or as CDFW officials in other capacities (Adams and DOES 1 – 5) to intentionally target Plaintiff, based on improper bias and ill-will towards Plaintiff, leading to selective prosecution and harassment, treatment very different from treatment provided to every other landowner in the San Gregorio Creek Watershed. In so doing, Defendants and each of them breached their duty as public officers to exercise the powers conferred on them with "disinterested skill, zeal, and diligence" (*Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1170 (1996) citing *Noble v. City of Palo Alto*, 89 Cal. App. 47, 51 (1928)), and also violated the common law, which prohibits public officials from placing their private or personal interests in conflict with their official duties (64 Ops. Cal. Atty. Gen. 795, 797 (1981)).

20.   Defendant Sampson had longstanding personal disagreements with Plaintiff that created biases, mostly arising from Plaintiff's exercise of his First Amendment rights through outspoken resistance to Defendant Sampson's overly aggressive and improper attempts to misapply regulations in a manner that adversely impacts work Plaintiff performs for third parties, including for Cal FIRE. Plaintiff reported these abuses to Defendant Sampson's superiors through a formal complaint and Defendant Sampson has held a substantial grudge against Plaintiff ever since. Defendant Sampson should have recused himself from working on this matter and, if properly disclosed and reported, his biases should have disqualified him from investigations or enforcement actions pertaining to Plaintiff, since he could not proceed in an unbiased manner.

21.   Defendant Ober resides on a property neighboring Plaintiff's property and the actions targeting Plaintiff (treating Plaintiff and his property differently than every other property and property owner in the San Gregorio Creek Watershed with regard to use of decreed water rights, use and maintenance of existing roads, alleged hazardous waste storage, etc.) were designed to, and did, improperly inure to the benefit of Defendant Ober's landlord who was not treated with the same level of scrutiny (allowed to utilize decreed water rights without citation, allowed to use and maintain existing roads with known discharge/erosion of sedimentation into the watershed, allowed to store environmentally hazardous waste materials including piles of discarded tires, etc. without being targeted for enforcement through civil claims). Defendant Ober was also incentivized to "investigate" the neighboring property because it allowed him to work closer to

his family and decreased his commute time while currying favor with his landlord. Defendant Ober has attempted to create a virtually constant presence on Plaintiff's private property through deployment of game cameras and other intrusive surveillance measures such as drones, in addition to the frequent warrantless site visits.

22.  Defendants DeLeon, Ajari and Battaglia acted out of vendetta against Plaintiff and his property based on strong personal feelings and dislike for Plaintiff due to Plaintiff's assertion of his rights to defend against what he believed to be improper agency actions and Plaintiff's determination to continue using the subject horseshoe road that was historically used for access between the two parcels of the subject property since the mid-1940s, and likely back to the 1800s.

23.  Defendants' strong personal animosity towards Plaintiff is demonstrated through conduct that Defendants have admitted was neither professional nor scientific with regard to the actions asserted against Plaintiff, including the following in addition to other indicia of animosity:

(i) using the "F" word indiscriminately in communications discussing Plaintiff,

(ii) intentionally delaying provision of reports to vex and prejudice Plaintiff in his preparations for trial of the civil claims,

(iii) hiding test results on water samples that were negative (exonerative evidence showing no hydrocarbon contaminants – no evidence of oil or oil-based products – in water samples obtained from the creek and from the road adjacent to the creek) while admitting any positive result would certainly have been included in the reports,

(iv) openly conspiring on how to try and spin the exonerating test results while not preserving drafts of the reports that became a "collaborative" effort between Defendants Sampson and Battaglia and without acknowledging all "collaborators" on the report,

(v) conspiring to proceed against Plaintiff in a manner that would force all decisions to be made by a judge (which they perceived to provide them a substantial advantage) and thereby attempting to deprive Plaintiff of any due process right to trial by a jury, and

(vi) threatening further attempts to harass Plaintiff by initiating additional civil actions against him because he was defending himself in the civil claims already instituted and was resisting against improper agency conduct.

6

24.  On information and belief, and through application of proper legal presumptions appurtenant to destroyed evidence (e.g., emails, text messages, draft reports and other evidence that should have been saved on laptops, servers, hard drives, cellphones, and similar devices with storage capability) that was intentionally and unlawfully destroyed while the investigations and civil claims were pending, such destroyed evidence would further show extreme personal biases leading to Defendants' violation of Plaintiff's Equal Protection, Fifth Amendment rights related to governmental takings by unlawfully targeting Plaintiff for selective prosecution and treatment different (far worse) than the treatment proffered every other landowner in the Watershed.

25.  Due to their strong personal feelings, Defendants and each of them, targeted Plaintiff and his property for repeated and continuous site visits and investigations either without obtaining warrants or through a pretextual warrant obtained under false pretense.

26.  Defendant Chau improperly involved herself in the targeting and investigations by directing Defendants Ober, Battaglia and Sampson to conduct further investigations without a warrant and outside the civil discovery rules (beyond discovery cutoff and on the eve of trial) in further attempts to create evidence in an attempt to bolster civil claims brought against Plaintiff, immediately after mandatory settlement conferences revealed that she likely lacked sufficient evidence to succeed on the civil claims.

27.  Defendants Chau, Chaudhry, Sampson, Ober, Battaglia, DeLeon and others conspired to deliberately fabricate false evidence to support a spurious claim that the historical road (clearly in existence and use from the 1940s and likely back into the 1800s) was first created by Plaintiff in 2015, even though they knew or should have known that the road existed and was used historically for access between the two parcels of Plaintiff's property.

28.  Defendants suppressed evidence including 1940's aerial photographs clearly depicting the road, a signed statement from the prior property owner and his wife (whose family farmed on that specific property dating back into the 1800s) who unequivocally stated that the subject road was always in existence and was used as the only access between the two parcels.

29.  Defendants then conspired to use manufactured evidence, including photographs taken after a landslide, to argue that the road didn't exist because they couldn't see the road when

they took the photographs, even though Defendant Ober admitted that his photos depicted a landslide that would be covering the road making him unable to see the road in his photos.

30.  Defendants falsely claimed to doubt landslide events occurred on the property, which might have obscured the road from view at various points in time following such landslides, even though Defendant Ober admitted his photographs appeared to depict a landslide covering a portion of the road, Defendant Sampson admitted to evidence of historical landslide events at the precise location of the photographs purporting to show no road was visible (because a recent landslide was covering it at the time), and a seminal document regarding protection of the watershed (San Gregorio Creek Watershed Management Plan, which was relied upon by Defendant Battaglia in one or more of her numerous "reports") clearly depicts landslide events and debris flows adjacent to the road and San Gregorio Creek on the subject property.

31.  In furtherance of their conspiracy to harass Plaintiff and effect an unconstitutional taking of Plaintiff's property without providing just compensation, Defendants Sampson, Ober, DeLeon, Ajari and Battaglia used numerous, continuous and harassing site visits (mostly without warrants, and on the one occasion a warrant was obtained, it was obtained through false pretense) to illegitimately encumber and devalue the property, manufacture false evidence, issue citations and reports based on unsubstantiated purported violations including, but not limited to:

(i) water diversions, even though such water diversions were legally appurtenant to riparian rights granted to the property through the governing water rights decree;

(ii) bolstering of the stream bank, which was emergency work done to protect property from erosion and to protect human life during landslide and flooding events;

(iii) emergency maintenance of the road, which was falsely labeled as creation of a new road, to clear landslide debris to protect property and the ability to have access between the two parcels and to ensure ability to use the road for emergency purposes during future landslide and flooding events in protection of property and life;

(iv) baseless claims of oil spilling without supporting test results (material observed and falsely labeled as oil was, in actuality, a Cal FIRE approved, environmentally benign dust suppression spray – testing was readily available but was intentionally not performed

8

because it would have proven Defendants' claim false and that Plaintiff was justified);

(v) omitting negative test results from their reports (testing showing no hydrocarbons in water samples from the creek and from the location of a claimed oil spill/leak were intentionally omitted from reports); and

(vi) conspiring to alter reports to support manufactured claims (text messaging between Defendants Sampson and Battaglia discussed how they viewed the exonerative, negative test results as "unfortunate" and Defendant Sampson suggested ways to try and misconstrue these results as somehow being against Plaintiff; then, after "collaborating" to create Defendant Battaglia's report, the report didn't mention the test results or the collaboration and all prior drafts of the report were intentionally destroyed).

32.  Every property owner in the San Gregorio Stream System diverts water from the stream system according to their water rights as decreed in the 1993 Water Rights Decree filed in San Mateo County Superior Court Case No. 355792 (these water rights transfer with the property and must be used or they are lost), yet Defendants targeted only Plaintiff for citations relating to "unpermitted" water diversions expressly allowed under the 1993 Water Rights Decree.

33.  All of the roads in the San Gregorio Creek Watershed (including 140 miles of state highway and county-maintained roads, 47 miles of roads controlled by the MidPeninsula Regional Open Space District and hundreds of miles of private roads quantified as averaging between 7.5 and 13 miles of road per square mile of land in the tributary watersheds) are known to increase sedimentation to the Creek and to the Watershed through ordinary use and maintenance of the roads, particularly after rainfall (as delineated in the governing Watershed Management Plan), yet Defendants targeted only Plaintiff for citations relating to sedimentation from use and maintenance of the existing road on his property, and conducted repeated, warrantless site investigations following heavy rains (including at the express direction of Defendant Chau) when it was known that sedimentation could be observed from every road in the watershed following those heavy rains.

34.  It is readily known to Defendants that oil and related waste storage exists at numerous properties in the watershed, including at "more than 80 oil wells [that] occur in the watershed

1  with five active oil wells and the rest either capped or idle" (according to the Watershed

2  Management Plan), yet Defendants targeted only Plaintiff for investigations, citations and civil

3  claims relating to alleged hazardous waste storage involving oil, none of which was quantified or

4  otherwise correctly substantiated with regard to Plaintiff specifically, or the property in general.

5       35.  Emergency work such as clearing of landslides, bolstering of creek banks and/or

6  other flood control/abatement work to protect life and property is routinely performed in the

7  watershed and is expressly exempted from all of the streambed alteration and related Fish &

8  Game Code statutes under which Defendants issued citations to Plaintiff, yet Defendants targeted

9  only Plaintiff for his performing of such emergency work on his property claiming that his

10  notification of such emergency work was not timely; **however, there is no authority for such**

11  **invalidation of the emergency work exception** (according to the plain language of the statute

12  found at F&G Code § 1610, only work that does not fit the definition of emergency work is

13  subject to the other streambed alteration prohibitions and according to California Public

14  Resources Code § 21060.3 "'Emergency' means a sudden, unexpected occurrence, involving a

15  clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage

16  to, life, health, property, or essential public services. **'Emergency' includes such occurrences as**

17  fire, **flood,** earthquake, **or other soil** or geologic **movements**, as well as such occurrences as riot,

18  accident, or sabotage.").

19       36.  Defendants Ajari and DeLeon had a letter sent threatening criminal or civil

20  prosecution based on enumeration of some of the faulty citations listed above without ever

21  providing notice or opportunity for Plaintiff to challenge the purported citations before civil

22  claims were initiated. (Completion of phase 1 of the trial for the civil claims justified Plaintiff's

23  resistance as the trial court ruled that Defendants' concocted evidence about the road being a

24  newly constructed road was nonsense; however, an injunction still issued based on a claim for

25  which Plaintiff never had notice – that he should be enjoined from maintenance or use of the road

26  other than in the same manner it existed and was used in the 1940s. Defendants alleged the road

27  never existed, not that Plaintiff's maintenance and use of the road should be restricted to a level

28  of maintenance and use established during some prior point in time. Plaintiff was never allowed

1   to present evidence or legal argument relating to this specific ruling that was based, in significant

2   part, on the trial judge's own independent research conducted after close of evidence and

3   Plaintiff's request to reopen trial for submission of evidence and argument on the point was

4   denied. This represents yet another due process violation directly caused by the procedural

5   irregularities created by Defendants through failure to provide Plaintiff notice and opportunity to

6   be heard (to legitimately challenge) the agency assertions prior to being prosecuted. The

7   opportunity to be heard in the context of judicial research translates to the opportunity to respond

8   to any new information the judge may have learned in the course of his or her own research,

9   particularly when such is used as a bases to grant relief that was not specifically requested.

10       37.   Defendant Sampson further assisted the conspiracy by making claims that Plaintiff

11   engaged in unlicensed timber harvesting through removal of a few trees, even though Defendant

12   Sampson admitted at trial that such removal of trees (even if they hadn't been diseased or

13   naturally fallen trees) would have required, at most, a ministerial permit that could not have been

14   refused; and, even though such tree removal occurs throughout the Watershed and only a couple

15   timber harvesting permits have been secured in the last two decades, yet no other landowners

16   have been prosecuted for such tree removals as unpermitted "timber harvesting".

17       38.   Defendant Chau improperly involved herself in investigations and fabrication of

18   evidence through disregard of clear evidence demonstrating existence of the road in the 1940's

19   and by (i) directing other Defendants, including Defendant Chaudhry, to deliberately manufacture

20   false evidence from which to try and claim the road didn't exist until 2015, and by (ii) directing

21   Defendants Ober, Sampson and Battaglia to manufacture additional evidence through further

22   warrantless site visits and "investigations" after discovery cutoff and on the eve of the trial

23   scheduled for civil claims being selectively brought against Plaintiff based on generalized

24   allegations and "evidence" that could be marshalled against every landowner in the Watershed.

25       39.   As a County of San Mateo employee and designated expert witness on behalf of San

26   Mateo County, which was the entity prosecuting the civil claims through its District Attorney's

27   Office, Defendant Chaudhry was a *de facto* employee of prosecuting counsel who joined the

28   conspiracy to deliberately fabricate false evidence to claim that the historical horseshoe road was

Complaint for Damages; Request for Jury Trial

first created by Plaintiff in 2015, with intentional blindness and disregard of evidence clearly establishing that the road existed at least as early as the 1940s and likely back into the 1800s.

40. Defendant County of San Mateo further conspired with Defendants to target Plaintiff, through its Planning & Building Department, including through actions on or after April 9, 2018, to delay granting/recommending denial of Plaintiff's permit applications aimed at continuing use of the historical road in the manner necessary to support the economic purposes for which he purchased the property. For instance, Defendant's Planning & Building Department:

> (i) supported their delayed grant/recommended denial of Plaintiff's permit requests by citing Defendants' contrived and false conclusion, that Plaintiff "created" the horseshoe road in 2015 (or in 2012 as stated in the April 9, 2018 Minutes), which is contrary to direct evidence that the road existed at least as early as the 1940s;

> (ii) as additional pretextual reasons to support not issuing a permit for use and maintenance of the existing road, Defendant County cited the numerous actions by Defendants targeting Plaintiff for selective prosecution based on generalized allegations and "evidence" that could be marshalled against every landowner in the Watershed; and

> (iii) before they would give due consideration to Plaintiff's road permit application, required onerous and expensive geotechnical support (cost-prohibitive roadwork at $300,000 to $500,000 or more for the approximate ¼ mile of the historical road, even though governing documents relating to road erosion control in the Watershed finds "It is recognized that most hillslopes in the San Gregorio Creek watershed are active or potential landslides and therefore [landslide-based erosions] may be unavoidable."). This same expensive geotechnical support is not similarly required for the owners of the other hundreds of miles of road in the Watershed that exist on what is objectively characterized as unstable land ("60 percent of the watershed area as 'mostly landslides' and the remainder as containing locally scattered small landslides (37 percent)" with only 3 percent flat to gently sloping ground incapable of generating landslides).

41. Defendant County of San Mateo has adopted local policies and/or practices, including working with other agencies to reject permits and otherwise encumber land as a means to drive

down the value of private lands before paying just compensation through eminent domain or inverse condemnation (regulatory takings) proceedings appurtenant to taking private lands such as Plaintiff's 114.44 acres in a watershed that is systematically being converted from private to public ownership (more than 50% of the watershed is now under public ownership).

42.  In furtherance of its policies to encumber and devalue land prior to compensation being paid for eminent domain/regulatory takings, Defendant County has also instituted policies and procedures to not simply prosecute civil claims against private property owners based on evidence provided by agencies involved in potential regulatory takings, but also becoming involved in the investigation and creation of evidence to turn its District Attorney's Office into a profit center collecting fees in the process. Indeed, the County of San Mateo District Attorney's Office advertises that they "file civil lawsuits on behalf of the People of the State of California . . . We work with a variety of state and local agencies **to investigate** and prosecute these cases."

43.  Defendant County of San Mateo's policies and procedures – assisting and directing the creation of evidence to generate revenue for the County through prosecution of civil claims while simultaneously devaluing property involved in potential governmental takings –  were a main driving force for participation by Defendants Chau, Chaudhry and County of San Mateo in the conspiracy to target Plaintiff for selective prosecution (including their deliberate manufacturing of false evidence) in a manner that treated Plaintiff differently than other similarly situated landowners in the San Gregorio Creek Watershed, as set forth herein, and in the process violating Plaintiff's constitutional rights and impairing his ability to resist a governmental taking of his property and/or to obtain just compensation for the taking of his private land.

44.  Defendant Adair was Defendant DeLeon's supervising biologist and was made aware of the targeting of Plaintiff by Defendant DeLeon and others through factually unsupported claims and was also aware of Defendant DeLeon's failure to preserve all electronic evidence (such as email communications) relating to the subject investigations, reports, citations and civil claims; but she was willfully blind to her subordinate's misconduct and/or otherwise ratified or approved such conduct knowing (knew or should have known) that it was likely to violate Plaintiff's constitutional rights, property interests and other legal rights.

45.  Defendant Adams and one or more of DOES 1 - 5 willfully destroyed, caused to be destroyed, encouraged and/or supported Defendants DeLeon's, Ober's, Battaglia's, and other's willful destruction of evidence through adoption of policies that automatically deleted emails and files from computers and servers without any type of litigation holds or protocols to preserve evidence in ongoing investigations that were reasonably anticipated to result in civil claims.

46.  Defendant Adams and one or more of DOES 1 - 5 also wiped, or caused to be wiped, Defendant DeLeon's and Defendant Ober's laptops and wiped many cell phones to intentionally destroy all emails, documents, files, texts and other electronic evidence relating to the subject investigations and civil claims, thereby depriving Plaintiff of his right to obtain, analyze and use such evidence both in defense of the civil claims and in protection of his constitutional rights to resist eminent domain proceedings or to prosecute inverse condemnation claims relating to his vested property rights and/or to receive just compensation for such takings.

47.  Even after the court made them specifically aware of the impropriety of such willful destruction and failure to preserve evidence, Defendants Ober, Sampson, Battaglia, and Adams either destroyed, allowed to be destroyed and/or actively participated in the continuing destruction of emails, texts, draft reports and other electronic evidence relevant to the subject investigations and civil claims while the civil claims were still pending.

**EXHAUSTION**

48.  Plaintiff need not exhaust administrative remedies prior to filing his 42 U.S.C § 1983 claims. *Monroe v. Pape*, 365 U.S. 167, 183 (1961) (rev'd on other grounds); *McNeese v. Board of Education*, 373 U.S. 668 (1963); *Patsy v. Florida Board of Regents*, 457 U.S. 496 (1982).

49.  This rule explicitly precludes the necessity for a section 1983 plaintiff to first sue for inverse condemnation in state court before filing their federal constitutional claims. *Pakdel v. City & Cty. of San Francisco* ___U.S.___, 141 S.Ct. 2226, 210 L.Ed.2d 617 (2021).

**ABSTENTION**

50.  Abstention is not warranted where, as here, the federal claims do not undermine state civil claims or proceedings. Regardless of whether Defendants prevail in obtaining a favorable judgment in the state claims, the instant federal claims do not challenge the validity of such a

14

potential judgment (review and rejection of any state court judgment is expressly not requested here). Rather, through these federal claims, Plaintiff seeks monetary damages only, based on evidence that those state civil claims could be prosecuted against every landowner in the Watershed and the manner in which such claims are being prosecuted only against Plaintiff created actionable violations of Plaintiff's constitutional rights based, in part, on vendetta and/or a regulatory taking of Plaintiff's vested property rights, and Plaintiff is entitled to collect the damages and just compensation sought here. See, e.g., *Duarte v. City of Stockton*, 60 F.4th 566, (9th Cir. 2023); *Behr v. Campbell*, 8 F.4th 1206 (2021) ("The question isn't whether the whole complaint seems to challenge a previous state court judgment, but whether resolution of each individual claim requires review and rejection of a state court judgment."); See also *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 402 (6th Cir. 2020); *Sprint Communications v. Jacobs*, 571 U.S. 69, 72 (2013) ("In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter.")

## STATUTE OF LIMITATIONS

51. Plaintiffs' claims accrued on or after January 6, 2023 when an injunction issued restricting maintenance and use of the road to the condition and level of use of the road circa the 1940s, and thereafter on or about March 17, 2023, when Defendants Battaglia and Sampson communicated through a memo their intention to continue efforts to "take" the road through overly onerous restrictions regarding use of the road (including requiring a physical presence on the property both through construction of concrete barriers and continuous unwarranted site inspections and elimination of the ability for Plaintiff to use the road access with his trucks and equipment, thereby preventing emergency equipment access necessary to restore the road and protect property and persons following landslide and flooding events and completely destroying the value of the property for the economic purpose – farm to table agricultural production and storage of trucks and equipment – that he purchased the property), even after losing at trial on the sole issue they presented through the fabricated claim that the road was first created in 2015.

52. Section 1983 claims, such as those asserted herein, are governed by the two-year

1   statute of limitations for personal injury claims as set forth in California Code of Civil Procedure

2   section 335.1. *Maldanado v. Harris*, 370 F. 3d 945, 954-55 (9th Cir. 2004).

3       53.  The continuing violation doctrine also applies to extend the statutes of limitations

4   here, as Plaintiffs have alleged (1) a policy and practice of discrimination and/or (2) a series of

5   related discriminatory acts. See *Green v. L.A. County Superintendent of Sch.*, 883 F. 2d 1472,

6   1480 (9th Cir. 1989).

7       54.  These section 1983 claims are exempt from the 6-month rule for claims presentment

8   in Cal. Gov't Code § 911.2. *Williams v. Horvath*, 16 Cal. 3d 834, 842 (1976); *Shah v. County of*

9   *L.A. Dep't of Health Servs.*, 2008 WL 2676533 (C.D. CA 2008) (citing *Williams v. Horvath*).

10                                **CONSPIRACY**

11       55.  Defendants, and each of them, shared in the common objectives of the conspiracy to

12   target Plaintiff for selective prosecution, to devalue his property, to take his vested property rights

13   without satisfying due process and without paying just compensation, and to otherwise harass

14   Plaintiff and violate his constitutional rights.

15       56.  It is not relevant that any particular Defendant did not know all the details of the

16   conspiracy, or that they did not take part in some of the due process violations. *United*

17   *Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (en banc) (It

18   is sufficient that Defendants "share[d] the common objective of the conspiracy.")

19                              **STATE ACTOR**

20       57.  Each Defendant is, and at all relevant times was, a state actor as a local government

21   agency or a state or local government official for the County of San Mateo, Cal FIRE and/or

22   California Department of Fish & Wildlife; and further, since each Defendant conspired with other

23   state officials to deprive Plaintiff of his constitutional rights, they acted under color of state law in

24   doing so. See *Tower v. Glover*, 467 U.S. 914, 920 (1984); *Dennis v. Sparks*, 449 U.S. 24, 27–28

25   (1980); *See also Lugar v. Edmondson*, 457 U.S. 922 (1982). The individual Defendants are sued

26   only in their individual capacities and not in their official capacities.

27                              **IMMUNITY**

28       58.  Defendants are not entitled to absolute immunity, since they conspired with state

1   officials to deprive Plaintiff of his constitutional rights. *Tower v. Glover*, 467 U.S. 914 (1984).

2       59.  In addition, potential immunity for a state actor in a civil rights action under 42

3   United States Code section 1983 is dependent on the specific function performed by a defendant

4   that gives rise to the claims for liability. *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003).

5       60.  The supervisorial or investigative functions at issue here are not entitled to immunity.

6   *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003); *Swift v. California*, 384 F.3d 1184, 1189 (9th

7   Cir. 2004) (parole officials not entitled to immunity for supervision of parolees as opposed to

8   determining whether to revoke parole); *Meyers v. Contra Costa County Department of Social*

9   *Services*, 812 F.2d 1154 (9th Cir. 1987) (officers of the court are only immune for quasi-

10  prosecutorial decisions and not for the investigatory function leading up to that decision); *Beltran*

11  *v. Santa Clara Cty.*, 514 F.3d 906, 908-09 (9th Cir. 2008) (concluding that immunity does not

12  apply to "investigatory conduct").

13      61.  District attorneys are not immune or insulated from section 1983 liability when they

14  participate in the investigatory function through activities such as (i) participation in search

15  warrants – e.g., directing searches with or without warrants, (ii) participation in deliberately

16  fabricating false evidence, (iii) participation in suppressing favorable evidence, (iv) giving advice

17  to enforcement officers, etc. See, e.g., *Burns v. Reed*, 500 U.S. 478 (1991).

18      62.  Similarly, expert witnesses involved in the investigative function (including through

19  fabrication of false evidence) do not have immunity from section 1983 liability. See, e.g., *Paine v.*

20  *City of Lompoc*, 265 F.3d 975, 983 (9th Cir. 2001); *Lisker v. City of Los Angeles*, 2015 WL

21  1260810 (9th Cir. Mar. 20, 2015); *Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015).

22                                      **FIRST CLAIM**

23                      42 U.S.C. § 1983-Fourteenth Amendment Equal Protection

24                          [Against All Defendants and DOES 1-15]

25      63.  Plaintiff re-alleges and incorporates Paragraphs 1-62, as though set forth herein.

26      64.  Under Title 42, section 1983, Plaintiff asserts a violation of the Fourteenth

27  Amendment to the United States Constitution, since Defendants denied Plaintiff equal protection

28  of the laws as a "class of one" when they targeted Plaintiff for selective prosecution, treating him

and his property differently than treatment afforded every other property owner and property in the San Gregorio Creek Watershed, as set forth in detail above. See *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000); *Squaw Valley Dev. Co. v. Goldberg,* 375 F.3d 936 (9th Cir. 2004).

65.  As also set forth above, Defendants conspired to target Plaintiff due to animosity and personal agendas rather than from any impartial, balanced plan reasonably designed to improve the health of the environment in the San Gregorio Creek Watershed in accord with governing watershed plans, such as the San Gregorio Creek Watershed Management Plan and/or the Water Quality Improvement Plan to Address the Sediment Impairment on San Gregorio Creek.

66.  In order to treat all other property owners in the watershed with the same level of scrutiny and prosecution brought to bear against Plaintiff and his property, Defendants would need to do the following, in addition to other measures:

(i) restrict/take all vested water rights provided through the 1993 San Gregorio Stream System Water Rights Decree and pursue civil claims similar to those pursued against Plaintiff for each property owner lawfully using their decreed water rights by diverting water from the San Gregorio Creek Stream System;

(ii) issuing citations for the known sedimentation that discharges from every road in the watershed, all of which impacts the Watershed (according to the governing San Gregorio Creek Watershed Management Plan) in the same general and unquantified amount as alleged in the civil claims pursued against Plaintiff and pursue civil claims, similar to those pursued against Plaintiff, against each property owner who maintains or uses an existing road in the Watershed;

(iii) conduct numerous, thorough, repeated and continuous investigations of every property where oil is known or reasonably suspected to be stored within the Watershed, including but not limited to properties where the more than 80 oil wells are located, most of which have been capped or are otherwise idle, and to require removal of all such hazardous wastes and pursue civil claims against all such property owners similar to those claims pursued against Plaintiff for unquantified amounts of oil or other wastes claimed to be stored on such properties;

18

(iv) disallow the F&G Code § 1610 emergency work exception to statutory requirements for all work performed by any property owner in the Watershed to restore hillsides bolster stream banks, abate flooding, etc. following heavy rains, floods and/or landslides and pursue civil claims against all property owners similar to those claims pursued against Plaintiff for emergency landslide, debris flow and flood abatement/remediation work;

(v) since a substantial portion of the roads in the Watershed exist on what is objectively characterized as unstable land ("60 percent of the watershed area as 'mostly landslides' and the remainder as containing locally scattered small landslides (37 percent)"), Defendant County should not issue permits for road construction or maintenance, nor allow road use in the Watershed for any of the hundreds of miles of roads present in the 60 percent of land area in the Watershed that is mostly landslides, certainly not without all of the same onerous and expensive geotechnical support (cost-prohibitive roadwork at $300,000 to $500,000 per approximate ¼ mile of road and even though "It is recognized that most hillslopes in the San Gregorio Creek watershed are active or potential landslides and therefore may be unavoidable") that Defendant County and their co-conspiratorial Defendants purported to require from Plaintiff before even considering whether to issue a permit to Plaintiff for continued use of the existing, historical road on his property, which provides the only legal access between the two parcels that comprise his property;

(vi) conduct numerous, thorough, repeated and continuous investigations of every property with decreed water rights to collect evidence of use of the water rights to divert water from the San Gregorio Stream System and pursue civil claims against all such property owners similar to those claims pursued against Plaintiff for unsubstantiated and/or unquantified amounts of water lawfully diverted pursuant to decreed water rights;

(vii) conduct numerous, thorough, repeated and continuous investigations of every property in the Watershed with existing roads to collect evidence of the known erosion and deposit of sedimentation from the roads into the watershed and pursue civil claims similar to those claims pursued against Plaintiff for unsubstantiated and/or unquantified amounts of sedimentation caused by the roads on such properties; and

19

(viii) obtain injunctions prohibiting use of roads or, in the alternative, prohibiting greater use or improvement of the roads in the watershed beyond the condition and use of the roads that existed historically in the 1940s.

67.   As a direct, legal and proximate result of Defendants' improper denial of equal protection to Plaintiff, through their conspiracy to target him for selective prosecution and treatment different from all other landowners in the Watershed based on improper motivations such as personal vendetta and attempts to devalue his land prior to paying required compensation for a governmental taking, Plaintiff has suffered damages in an amount to be proven at trial.

68.   Each individual Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiff's rights as set forth above.

**SECOND CLAIM**

42 U.S.C. § 1983-Fifth Amendment Takings

[Against All Defendants and DOES 1-15]

69.   Plaintiff re-alleges and incorporates Paragraphs 1-68, as though set forth herein.

70.   Under Title 42, section 1983, Plaintiffs assert a violation of the Fifth Amendment to the United States Constitution, as depriving Plaintiff of property, without just compensation.

71.   Each of the individual Defendants, acting in their individual capacities and as state or local government authorities, conspired with other government officials to effect the taking of Plaintiff's property without paying just compensation.

72.   Defendant County utilized established policies and procedures to encumber and devalue Plaintiff's property so he could not obtain the just compensation required for a governmental taking, and also to intentionally fabricate false evidence in support of civil claims violating Plaintiff's equal protection rights and attempting to exact civil fines from Plaintiff rather than paying just compensation for "taking" the road.

73.   Where government requires an owner to suffer a permanent physical invasion of his or her property, regardless of how minor, it must provide just compensation. *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 538 (2005) (when regulatory actions are so onerous that the effect is tantamount to direct appropriation or ouster, it becomes a taking). "[A] property owner acquires

20

an irrevocable right to just compensation immediately upon a taking." *Knick v. Township of Scott, Pennsylvania*, 139 S.Ct. 2162, 2172 (2019).

74.  Moreover, regulations prohibiting a landowner's intended development of land for economic purposes, based on a claim that such use would significantly increase the amount of sediment entering environmentally sensitive waters (Lake Tahoe) does not fit the requirements for an affirmative defense within the *Lucas* "background principles" exception to a taking. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 34 F.Supp.2d 1226 (D Nev 1999), aff'd in part and rev'd in part on other grounds 216 F.3d 764 (9th Cir.), aff'd 535 U.S. 302 (2002) (a much more significant contribution to the problem by the enjoined would be required to create the affirmative defense.)

75.  Defendants obtained an injunction on January 6, 2022 prohibiting Plaintiff from using the road for access between his two properties and prohibiting improvements, maintenance or use of the road beyond what existed in the 1940s unless he first obtains a permit from the County, which Defendants have now made clear will not be approved, resulting in complete frustration/destruction of the economic purpose for which Plaintiff acquired the property. Defendants have, in fact, made clear that they will continue to harass Plaintiff in violation of his equal protection rights as set forth above, unless he relents and gives up his rights to improve, maintain and use the road in a manner consistent with current requirements for access by his equipment, between the two parcels that comprise his property, and as required to ensure proper emergency equipment can be employed to protect both property and persons during future landslides, floods or other similar emergencies.

76.  On or about March 17, 2023, Defendants sent a memorandum to counsel for Plaintiff, making clear they intend to continue selectively enforcing regulations against Plaintiff in such an onerous manner that it will be cost prohibitive for him to attempt to retain ownership of the property and specifically purporting to require Plaintiff to allow Defendants a continuous presence on his property and to place permanent structures in the middle of the road to prevent passage by current model farm equipment and emergency vehicles for landslide and flood abatement/remediation, thereby virtually assuring that the road will be wiped out during a future

1  landslide or flood event and Plaintiff would not have the ability to conduct the emergency work

2  necessary to restore the road and to protect life and property in the area.

3      77.  Defendants continue to interfere with Plaintiff's rights to divert water, as granted to

4  the property through the 1993 Water Rights Decree, and such interference with water rights is a

5  violation of the 1993 Water Rights Decree and also constitutes a physical taking of a vested

6  property right requiring just compensation.

7      78.  The onerous regulatory requirements forced upon Plaintiff as the sole landowner in

8  the entire Watershed targeted for this type of regulatory enforcement and civil claims constitutes

9  a taking requiring just and reasonable compensation.

10      79.  Defendants' overly cumbersome mandates are meant to force Plaintiff from his

11  property, go well beyond what is required of every other landowner in the Watershed, and are not

12  actions supported by either the San Gregorio Creek Watershed Management Plan and/or the

13  Water Quality Improvement Plan to Address the Sediment Impairment on San Gregorio Creek.

14      80.  As a direct, legal and proximate result of Defendants' conduct, Plaintiff's property

15  has been taken and he has suffered the amount of unpaid just compensation he is owed for the

16  taking as well as other damages in an amount according to proof at trial.

17      81.  Each individual Defendants' conduct was malicious, oppressive or in reckless

18  disregard of Plaintiff's rights as set forth above.

19  **THIRD CLAIM**

20  42 U.S.C. § 1983-Procedural Due Process

21  [Against All Defendants and DOES 1-15]

22      82.  Plaintiff re-alleges and incorporates Paragraphs 1-81, as though set forth herein.

23      83.  Under Title 42, section 1983, Plaintiff asserts violations of the 5th and 14th

24  Amendments to the United States Constitution, as depriving Plaintiff of property, without due

25  process of law (procedural due process).

26      84.  Plaintiff has vested rights as owner of the 114.44 acres in two parcels that comprise

27  his property, which carries decreed riparian water rights that travel with the property and which

28  he purchased for the express purpose of farming the back parcel, including storage of his

equipment and trucks and accessing the back parcel through use of the historical road as the only legal access between the two parcels and the only access to the back parcel without trespassing across a neighbor's property (in other words, the road is an easement between the two parcels).

85.  Plaintiff is entitled to notice and an adequate opportunity to be heard (opportunity to have his challenge to agency action or citation heard) prior to deprivation of his rights and property through civil or criminal proceedings.

86.  Plaintiff is entitled to the process of a straightforward eminent domain/condemnation action or inverse condemnation action to determine the propriety of taking of his property for public use and establishment of just compensation for the taking without first being compelled to suffer the expenditures, encumbrances and appearance of diminished land value caused by the unconstitutional actions of the vindictive conspiracy set forth above.

87.  Defendants initiated the harassment and selective prosecution of Plaintiff through a search conducted with a warrant obtained through false pretense and then sent a letter to Plaintiff citing numerous complaints about how Plaintiff was using his private property.

88.  The letter demanded that Plaintiff comply with all of the extremely onerous agency "requirements", including to cease use of the historical road, and threatened criminal or civil prosecution if he did not comply. The letter did not contain any notice of rights to contest Defendants' citations through agency appeal.

89.  Without providing Plaintiff a reasonable opportunity to be heard to contest the statements and purported findings and conclusions contained in the May 23, 2012 letter, including the nonsensical conclusion that the historical road was somehow a new road constructed by Plaintiff, civil claims were initiated against Plaintiff in 2017 based on the letter.

90.  Plaintiff has never been provided a reasonable opportunity to contest, through non-arbitrary agency review, Defendants' spurious "conclusions" in their May 23, 2012 letter.

91.  Defendant County noted the letter's purported conclusions as grounds to recommend denial of Plaintiff's permit applications for use of the road on his property, specifically citing the now debunked false assertion that it was a new road as opposed to the historical road used as the sole legal means of passage between the two parcels that comprise the subject property.

92.  In phase 1 of the trial of the civil claims, Plaintiff established that he was justified in resisting Defendants' selective prosecution when the trial court agreed Defendants' manufactured evidence was nonsense in light of 1940s aerial photographs and personal statements from two members of the family that continuously owned and used the subject property, and the road, in the mid-1900s, and family history described use of the road dating back as early as the 1800s.

93.  However, the trial court still issued an injunction restricting use of the road to the manner in which it was used and maintained in the 1940s, which is a remedy Defendants never sought and involving issues about which Plaintiff was not provided notice or an opportunity to brief or to provide relevant evidence. In fact, the trial court based its final decision, in significant part, on independent research of adjudicatory facts conducted by the judge after conclusion of the presentation of evidence then denied Plaintiff's request to reopen trial to allow Plaintiff to provide directly relevant evidence and on point legal authorities.

94.  All of these procedural irregularities created by Defendants' actions have severely prejudiced Plaintiff and constitute a denial of his procedural due process. See, e.g., *Nicholson v. County of Stanislaus*, 2010 U.S. Dist LEXIS 23424; 2010 WL 92329 (ED CA 2010).

95.  The goal of Defendants' conduct is to convert Plaintiff's private property to public use without paying just compensation, as described in detail above, but the process that should have been due to Plaintiff would have been a straightforward eminent domain/condemnation proceeding or inverse condemnation claim where Plaintiff could have defended against the taking and/or made the case to a jury to establish the amount of compensation required for the taking.

96.  It was, however, Defendants' design to proceed with civil claims under an unfair business practices rubric, which under current California law can be submitted solely to the court for all determinations (a strategy that Defendants perceived as providing them significant advantage over Plaintiff by not allowing a jury to make any determinations) and, therefore, proceeding in this manner deprived Plaintiff of his right to have a jury involved in deciding the fate of his property. This represents yet another procedural irregularity and due process violation.

97.  As a direct, legal and proximate result of Defendants' conduct, Plaintiff's property has been taken and he has suffered the amount of unpaid just compensation he is owed, as well as

1   other damages in an amount according to proof at trial.

2        98.  Each individual Defendants' conduct was malicious, oppressive or in reckless

3   disregard of Plaintiff's rights, as set forth above.

4                                 **FOURTH CLAIM**

5                        42 U.S.C. § 1983-Substantive Due Process

6                        [Against All Defendants and DOES 1-15]

7        99.  Plaintiffs re-allege and incorporate Paragraphs 1-98, as though set forth herein.

8        100. Under Title 42, section 1983, Plaintiff asserts violations of the 5th and 14th

9   Amendments to the United States Constitution, as depriving Plaintiff of rights that are

10  fundamental, and "implicit in the concept of ordered liberty."  This includes the protection against

11  "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used

12  to implement them."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

13       101. Plaintiff has vested rights as owner of the 114.44 acres in two parcels that comprise

14  his property, which carries decreed riparian water rights that travel with the property and which

15  he purchased for the express purpose of farming the back parcel, including storage of his

16  equipment and trucks and accessing the back parcel through use of the historical road as the only

17  legal access between the two parcels and the only access to the  back parcel without trespassing

18  across a neighbor's property (in other words, the road is an easement between the two parcels).

19       102. The vindictive conduct by Defendants that intentionally singled Plaintiff out for

20  repeated warrantless site investigations, permit denials, manufacture of false evidence attempting

21  to label the historical road as a new road, requiring additional permits to divert water pursuant to

22  water rights already granted pursuant to the 1993 Water Rights Decree (which violates the terms

23  of the Water Rights Decree) requiring more than $1 Million of work including a geotechnical site

24  survey and onerous geotechnical support for a ¼ mile road (that governing documents already

25  acknowledge cannot be protected against landslides similar to 60% of the roads in the

26  Watershed), civil claims based on "citations" that could be levied against every landowner in the

27  Watershed, threatened further civil actions if Plaintiff does not agree to abandon the road, as well

28  as the other conduct set forth above, is a violation of substantive due process.

103. Moreover, the focus on Plaintiff is not warranted under the Watershed Plan or other planned protection of the Watershed and there are other properties far more deserving of Defendants' scrutiny, including Defendant Ober's landlord's property where a mountain of worn tires are stored (and routinely wind up in San Gregorio Creek after heavy rains), the more than 80 oil wells in the Watershed (where large amounts of oil are stored in the capped or idle wells and associated infrastructure), and the 140 miles of state and county maintained roads in the watershed (that sustain far more intense traffic, support much larger loads, and create far more extensive sedimentation to the watershed).

104. The fact that similar site investigations on virtually every other property in the Watershed could readily lead to the same type of citations and civil claims brought against Plaintiff, while only Plaintiff has been singled out for this treatment, is further evidence of the violation of his substantive due process rights.

105. As a direct, legal and proximate result of Defendants' conduct, Plaintiff's property has been taken and he has suffered the amount of unpaid just compensation he is owed, as well as other damages in an amount according to proof at trial.

106. Each individual Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiff's rights, as set forth above.

**FIFTH CLAIM**

42 U.S.C. § 1983 – 14th Amendment – State-Created Danger

[Against All Defendants and DOES 1-15]

107. Plaintiff realleges and incorporates Paragraphs 1 through 106 as though set forth herein.

108.  Under the Fourteenth Amendment, a person has the constitutional right to be free from a government employee affirmatively placing that person in a position of actual, particularized danger (or in a situation of actual, particularized danger that is more dangerous than the position that the person already faced) if the government employee acted with deliberate indifference to a known or obvious danger.

26

109. As set forth above, Defendants conspired to deprive Plaintiff of equal protection, due process and just compensation and, in furtherance of their scheme, Defendants obtained an injunction that restricts use of the road in a manner calculated to prevent access by emergency vehicles and equipment necessary to protect property and life during recurrent flooding and landslide events known to historically occur at the property.

110. The main purpose of Defendants' common scheme is to force the road to be destroyed by such floods and landslides that are reasonably certain to occur based on historical events, and that Plaintiff will be precluded from his ability to conduct the emergency work necessary to preserve the road, but Plaintiff expressly made Defendants aware that this injunction would also place lives and property in peril.

111. Notwithstanding the knowledge that the injunction would make it impossible to conduct emergency work to abate, control, and remediate flooding and landslides that routinely occur (See e.g., Cal FIRE and County of San Mateo Provision CFS-004 requiring emergency access roads to have a minimum width of twenty feet for safe emergency vehicle and equipment access while Defendants want to restrict the width of the road to seven feet or less), Defendants chose to act with deliberate indifference to such known or obvious dangers by insisting upon extreme measures to enforce the injunction, all to harass Plaintiff.

112. Accordingly, Defendants' conduct creates an actual, particularized danger to cause injury to Plaintiff and to others that was foreseeable.

113. Defendants disregarded a known/obvious consequence of their actions – they know that something will happen, in fact their scheme is designed to ensure it happens, but ignored the substantial risk of injury to persons and property and exposed Plaintiff and others to that risk.

114. As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered damages as his property has been artificially devalued due to the disclosure of such risks that would need to be made to any potential purchaser and the amount of that damage will be established upon notice according to proof at trial.

115. Each individual Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiff's rights, as set forth above.

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SIXTH CLAIM

42 U.S.C. § 1983 – 1st Amendment – Chilling Citizen's Rights

[Against All Defendants and DOES 1-15]

116. Plaintiff realleges and incorporates Paragraphs 1 through 115 as though set forth herein.

117. Under the First Amendment, a citizen has the right to free expression, to petition the government and to access the courts.

118. Plaintiff was engaged in constitutionally protected activity by (i) not giving permission for numerous warrantless and unwarranted site inspections, (ii) reporting excessive conduct by Defendant Sampson to his superiors; (iii) defending himself against the various charges made by Defendants, (iv) defending himself against the civil claims, (v) using the water rights granted by Decree, and (vi) by refusing to abandon the historical road on his property.

119. Defendants' vindictive actions against Plaintiff in response to his protected activities would chill a person of ordinary firmness from continuing to engage in the protected activities.

120. Plaintiff's engaging in the protected activities listed above was a substantial or motivating factor in each Defendant's vindictive conduct against Plaintiff.

121. As a direct, legal and proximate result of Defendants' conduct, Plaintiff has suffered damages in defending against the retaliatory and "chilling" conduct according to proof at trial.

122. Each individual Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiff's rights, as set forth above.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants as follows:

1.   Economic damages (special damages) including just compensation for the takings, and remunerations for damages incurred to defend against, and respond to, Defendants' conduct;

2.   Non-economic damages (emotional distress, compensation for rights violations, etc.);

3.   Exemplary damages against all Defendants except Defendant County of San Mateo;

4.   Prejudgment and post-judgment interest;

5.   Attorneys' fees, expert fees and all costs of litigation, pursuant to 42 U.S.C. § 1988;

6.   Costs of suit; and

7.   Such other relief as the Court deems just and proper.

Dated: July 27, 2023                    Respectfully submitted,

                                        LAW OFFICE OF JONATHAN MCDOUGALL

                                        By:_____
                                              EVAN C. NELSON
                                        Attorneys for Plaintiffs

## **REQUEST FOR JURY TRIAL**

Plaintiff requests a jury trial.  Fed. R. Civ. Proc. 38(b).

Dated: July 27, 2023                    Respectfully submitted,

                                        LAW OFFICE OF JONATHAN MCDOUGALL

                                        By:_____
                                              EVAN C. NELSON
                                        Attorneys for Plaintiff

Complaint for Damages; Request for Jury Trial